*338 OPINION OF THE COURT
Judith M. Reichler, J.
On March 6, 2004, in New Paltz, New York, two ordained ministers of the Unitarian Universalist Church performed marriage ceremonies for 13 same-sex couples who did not have marriage licenses. They are charged with a crime for solemnizing marriages without licenses being presented to them, in violation of section 17 of the Domestic Relations Law. Conviction could result in a maximum fine of $250 and/or incarceration for a maximum of one year.
The defendants claim that the charges against them are unconstitutional because the same-sex couples whose marriages they solemnized were unconstitutionally denied the ability to obtain marriage licenses. The defendants also argue that criminalizing the solemnization of unlicensed same-sex marriages by ordained clergy unconstitutionally infringes on the exercise of their religion and their religious belief that marriage is a desirable and holy state for all couples, including gay and lesbian.
The court may dismiss charges against a criminal defendant if the statute defining the offense charged is unconstitutional or otherwise invalid. (CPL 170.35.)
Domestic Relations Law § 17 very simply states that a person who performs a marriage without being presented with a marriage license is guilty of a misdemeanor. It makes no distinction between same-sex and heterosexual couples. The Clerk of the Town of New Paltz, however, acting on an interpretation by the New York State Department of Health that Domestic Relations Law § 13 allows only marriages between a man and a woman, had announced that he would not issue marriage licenses to same-sex couples. The couples married by the defendants were unable to obtain the required marriage licenses.
The prosecution argues that the constitutionality of same-sex marriage is not before the court, and that the only issue is whether the defendants have violated the plain language of Domestic Relations Law § 17. The defendants argue that the constitutionality of same-sex marriage is before the court, and that a determination of the rights of the same-sex couples is necessary for their defense to the criminal charges.
I find that the two issues are inextricably intertwined, and that defendants meet the requirements for standing under the principles set forth by the United States Supreme Court in Eisenstadt v Baird (405 US 438 [1972]) and Griswold v Con *339 necticut (381 US 479 [1965]; see also New York County Lawyers’ Assn. v State of New York, 294 AD2d 69 [1st Dept 2002]). If it is unconstitutional to prohibit same-sex couples from obtaining marriage licenses, it is unconstitutional to charge defendants with a crime for marrying same-sex couples who are unable to obtain marriage licenses. The fact that there may be other ways the couples could have challenged their inability to obtain marriage licenses does not change this.
The defendants acknowledge that the State has an interest in regulating marriage. Even so, they argue that it is unconstitutional for the State to limit marriage to opposite-sex couples. In order for a statute to survive even the most deferential standard of review for constitutionality (the so-called “rational basis” test), there must be a rational relationship between the classification adopted and the societal interest it purports to promote. (Romer v Evans, 517 US 620 [1996].) Under this standard of review, a statute is presumed to be valid and will be sustained if the classification drawn is rationally related to a legitimate state interest. (City of Cleburne, Tex. v Cleburne Living Ctr., 473 US 432, 440 [1985].)
The prosecution has advanced two state interests for limiting marriage to opposite-sex couples: tradition and procreation. The New York State Attorney General, although given an opportunity to do so,* has not offered additional justification, and no reasons are contained in the statute. The justifications proffered by the prosecution can be summarized as follows:
(1) There is a long tradition of political, cultural, religious, and legal consensus that marriage is understood as the union of male and female.
(2) Statutes prohibiting same-sex marriages further the state interest of encouraging procreation and child rearing within a marital relationship.
I find that “tradition” is not a legitimate state interest, and that prohibiting same-sex couples from marrying is not rationally related to furthering the State’s legitimate interest in providing a favorable environment for procreation and child rearing. Accordingly, the criminal charges against the defendants must be dismissed. Discussion follows.
*340 Traditional Definition of Marriage
Tradition does not justify unconstitutional treatment. Slavery was also a traditional institution.
The definition of “family” has changed so much over the years that it is difficult to speak of an average American family. (See Troxel v Granville, 530 US 57, 63 [2000].) The traditional definition of marriage has also undergone many changes, especially as gender roles have expanded. Concepts that were once considered essential to the definition have been abandoned or even declared illegal.
A starting point is found in Domestic Relations Law § 10, which reminds us that “[m]arriage, so far as its validity in law is concerned, continues to be a civil contract.” The civil marriage laws set forth the benefits and obligations of legally married couples, almost all of which come into play only upon dissolution, or a breakdown, of the marriage. (See Domestic Relations Law §§ 30-254.)
The definition of civil marriage, it appears, is flexible and subject to change — an “evolving paradigm.” (Goodridge v Department of Pub. Health, 440 Mass 309, 339, 798 NE2d 941, 967 [Sup Jud Ct 2003].) At one time, the traditional marriage was arranged primarily to further the property interests of families. Until 1849, when the first of the Married Women’s Acts was enacted, a tradition of marriage was that a married man owned all his wife’s property, while a married woman could own no property. The Court of Appeals described it this way: “The inferior [the wife] hath no kind of property in the company, care or assistance of the superior [the husband] as the superior is held to have in those of the inferior.” (Allen v Allen, 246 NY 571, 575 [1927], quoting 3 Blackstone, Commentaries on the Laws of England, at 143; see Domestic Relations Law §§ 50-61 [for a repeal of these laws].)
The traditional definition of marriage in some states excluded interracial marriages, and laws provided stiff criminal penalties for persons who married “outside their race.” That restriction on marriage was struck down by the United States Supreme Court, in 1967, when it ruled that a statutory scheme to prevent marriages between persons solely on the basis of racial classifications is unconstitutional. (Loving v Virginia, 388 US 1 [1967].)
Even as late as 1984, the traditional definition of marriage in New York included the right of a husband to be free of criminal charges for raping his wife. Similar statutes existed in at least *341 30 other states. In ruling the law unconstitutional, New York’s Court of Appeals commented that this so-called marital exemption likely originated in an 1852 treatise, traceable to a statement made by the 17th century English jurist Lord Hale, who wrote: “[The] husband cannot be guilty of a rape committed by himself upon his lawful wife, for by their mutual matrimonial consent and contract the wife hath given up herself in this kind unto her husband, which she cannot retract.” (People v Liberta, 64 NY2d 152, 162 [1984] [emphasis added], quoting 1 Hale, History of Pleas of the Crown, at 629.) The Court rejected all the justifications the State offered, finding that “the traditional justifications ... no longer have any validity.” (64 NY2d at 164.)
The prosecution points out that, even with all the changes that have occurred in the definition of marriage, never has the court gone so far as to include same-sex couples in the definition. The fact alone that the discrimination has been sanctioned by the State for many years does not justify it. (See Perez v Lippold, 32 Cal 2d 711, 727, 198 P2d 17, 27 [Sup Ct 1948], citing Shelley v Kraemer, 334 US 1 [1948].)
Religion and Marriage
Many marriages are celebrated in a religious setting. Whatever meaning and sanctity may attach to a religious marriage ceremony, however, marriage is a civil contract, and state marriage laws are entirely civil in nature. (Domestic Relations Law § 10.) Although the authority to officiate at civil marriage ceremonies has been extended to members of the clergy (in addition to certain public officials, such as mayors and magistrates), this does not alter the fact that state-sanctioned marriage is a civil event, not a religious one. (Domestic Relations Law § 12.)
The religious beliefs of some individuals and groups include a conviction that same-sex unions are unnatural and abhorrent. They would urge that their beliefs be incorporated into the law, as reflecting a divinely ordained definition of marriage. This was also the argument once successfully advanced to justify prohibition of interracial marriages. (See Scott v State, 39 Ga 321, 326 [1869] [justifying laws against interracial marriage because “(t)he God of nature made it otherwise”].) The United States Supreme Court finally rejected this restriction on marriage as unconstitutional in 1967. (Loving v Virginia, 388 US 1, 2 [1967].) In doing so, it overturned a lower court opinion that had offered the following religion-based reason for excluding *342 interracial couples from marrying (at 3): “Almighty God created the races white, black, yellow, malay and red, and he placed them on separate continents. And but for the interference with his arrangement there would be no cause for such marriages.”
Ironically, the defendants would also define marriage based on religious tenets. They argue that, by prosecuting them for solemnizing same-sex marriages, the State is preventing them from exercising an aspect of their religious beliefs that “the gender of the members of a couple is not a factor in determining whether they are appropriate candidates for marriage.” (Defendant’s mem of law at 27.) Their religion, defendants say, “recognizes the sanctity of same sex relationships and has supported the solemnization of their holy union.” (Greenleaf affidavit, dated May 1, 2004, at 2.)
Even though the State has granted a clergy member the authority to perform civil marriages (which some do in conjunction with a religious service), a lawful marriage that is subject to the laws of the State remains a civil contract, appropriately free of religious beliefs. Since the State has made an accommodation by permitting clergy to act in the state capacity of officiating at civil marriage ceremonies, the State does not violate the free exercise of religion by imposing valid restrictions on the ability to do so.
Procreation
Citing “procreation” as a broad justification for denying marriage to same-sex couples displays an antigay bias rather than a real desire to provide a favorable environment for procreation and child rearing. If family and children were truly the priority, the State would take all possible steps to protect them.
The prosecution acknowledges that married couples are not required to have children, or even to engage in sexual relations. No inquiry is ever made into the sexual activities or sexual preferences of a prospective opposite-sex couple before a marriage license is issued. In fact, all sorts of people can marry and have children: convicted murderers, child abusers, pedophiles, racketeers, and drug pushers.
It has long been recognized that the sexual orientation, alone, is not a factor in determining the appropriateness of adoption or custody of a child. (See 18 NYCRR 421.16 [h] [2] [single gay men and lesbians may adopt children]; Matter of Carolyn B., 6 AD3d 67 [4th Dept 2004] [the sexual orientation of the petitioners is of no significance because the goal of the statute is to *343 encourage adoption of children]; Guinan v Guinan, 102 AD2d 963 [3d Dept 1984] [whether defendant had a sexual relationship with another women is not determinative in a custody dispute, unless this is independently shown to adversely affect the child’s welfare].) Many same-sex couples raise children, adopted or conceived by one of the partners. Some are raising the children of one partner that were conceived during a heterosexual marriage that failed. Excluding same-sex couples from civil marriage makes these children less, not more, secure.
Same-sex relationships are based on the same thing as heterosexual unions: intimacy, companionship, love, and family. Prohibiting same-sex couples from marrying suggests that marriage is about nothing but sex. This is demeaning to all couples who seek to marry and to the institution of marriage. Disapproval of a group is an insufficient reason for exclusion. (Lawrence v Texas, 539 US 558 [2003].)
Economic and Legal Benefits of Marriage
Mixed-sex couples who do not love each other can marry. Couples who do not even like each other can marry. Regardless of the relationship a married couple has, legal privileges are granted to improve their economic, emotional, and physical health — simply because of their marital status. There can be no constitutional rationale for denying same-sex couples the right to receive the benefits that are so lavishly bestowed on mixed-sex couples.
Marriage laws provide many financial and legal protections to married couples. The United States General Accounting Office has identified 1,049 federal laws in which benefits, rights, and privileges are contingent on marital status. (See US Gen Acct Off, Defense of Marriage Act, GAO/OGC-97-16 [Washington, D.C., Jan. 31, 1997]; US Gen Acct Off, Defense of Marriage Act: Update to Prior Report, GAO-04-353R [Washington, D.C., Jan. 23, 2004].) Benefits, rights, and privileges were found in all of these areas: (1) Social Security; (2) programs to alleviate poverty, such as housing, food stamps, and public assistance; (3) veterans and military programs; (4) taxation; (5) employment; (6) immigration; (7) criminal and family violence laws; (8) loans and credit; and (9) education.
In New York, some employers and agencies offer limited benefits to partners of same-sex couples. Many more benefits, however, are available only to married couples. They include such things as status as next-of-kin for hospital visits; the ability to make medical decisions in the event a spouse becomes *344 sick or disabled; joint health, home, and auto insurance policies; access to a spouse’s disability and pension benefits; inheritance rights when a spouse dies intestate; joint income tax returns; family discounts from employers, banks, insurers and businesses; the legal protections afforded in the case of a divorce; the right to spousal support; the right to sue for wrongful death of a spouse; decision-making power with respect to whether a deceased partner will be cremated or not and where to bury him or her; and Family Court domestic violence protection orders. (See Testimony of New York State Comptroller Alan G. Hevesi in Support of the Right to Civil Marriage for Same-Sex Couples in New York State [<http://www.osc.state.ny.us/press/releases/ mar04/030304b.htm> (accessed July 11, 2004), cached at <http:// www.courts.state.ny.us/reporter/webdocs/030304b.htm>].)
Using a purely pragmatic approach, there are many ways these inequities could be remedied. It is doubtful, however, that they would completely address the complicated reasons individuals have for wanting to join in marriage.
Other Court Decisions
Any reasons that have been developed for singling out and prohibiting — even criminalizing — same-sex relations have been all but abolished. (See, e.g., Lawrence v Texas, 539 US 558 [2003] [invalidated a state sodomy law that criminalized only members of the same sex from engaging in certain kinds of sexual activity]; Romer v Evans, 517 US 620 [1996] [invalidated a state constitutional amendment that deprived gay men and lesbians of certain protections granted to heterosexual individuals under state law].)
New York’s highest court has consistently extended rights and benefits to same-sex partners. (See, e.g., Braschi v Stahl Assoc. Co., 74 NY2d 201 [1989] [interpreted the term “family member” in the rent control code to include a same-sex partner in a committed, long-term relationship]; Matter of Jacob, 86 NY2d 651 [1995] [held that the same-sex partner of the biological parent of a child could adopt the child].) New York courts have held that the sexual orientation of an individual, alone, is of no significance in making adoption and custody decisions. (See Matter of Carolyn B., 6 AD3d 67 [4th Dept 2004]; Guinan v Guinan, 102 AD2d 963 [3d Dept 1984].)
New York statutes have regularly been amended to prohibit discrimination against any individuals on the basis of sexual orientation and to extend rights and benefits to same-sex partners. (See, e.g., Civil Rights Law § 40-c; Executive Law § 290 *345 et seq. [the opportunity to obtain employment and education and to use public accommodations, housing, and commercial space may not be denied on the basis of sexual orientation]; 9 NYCRR 4.28, 5.32 [benefits must be offered to the domestic partners of state employees]; 9 NYCRR 2104.6 [state housing regulations recognize same-sex relationships]; 18 NYCRR 421.16 [h] [2] [single gay men and lesbians may adopt children].)
In an opinion issued in March of this year, New York’s Attorney General acknowledged that New York law recognizes the legitimacy of committed same-sex relationships in numerous ways and questioned the State’s interest in maintaining the historical understanding of marriage as confined to opposite-sex partners. (2004 Ops Atty Gen No. 12004-1, at 19 [Mar. 3, 2004].)
The Honorable Jonathan D. Katz, in dismissing similar charges against the Mayor of New Paltz, found that “none of the reasons stated in opposition to same-sex marriage is paramount to the equal protection guarantees enshrined in the State and federal constitutions.” (People v West, 4 Misc 3d 605, 608 [New Paltz Just Ct 2004].)
The United States Supreme Court has not yet ruled on the precise issue, but Justice Antonin Scalia made a persuasive argument for recognizing same-sex marriage in his scathing dissenting opinion, a year ago, in Lawrence v Texas (539 US 558, 605 [2003] [striking down a statute making it a crime for persons of the same sex to engage in certain intimate sexual conduct]). The majority opinion makes clear that its ruling does not address whether there should be formal recognition of homosexual relationships, but Justice Scalia warns us not to believe it. Instead, he insists that the majority’s rationale regarding personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education applies to homosexual relationships. Given the broad scope of the majority opinion, he adds (at id.) “what justification could there possibly be for denying the benefits of marriage to homosexual couples exercising ‘[t]he liberty protected by the Constitution’ . . . ? Surely not the encouragement of procreation, since the sterile and the elderly are allowed to marry.”
For the reasons stated herein, the motion to dismiss the charges against the defendants is granted, and the charges are dismissed.

 The Attorney General has informed this court that it chooses not to participate “at this stage,” and asks the court not to draw an adverse inference from this decision. None is drawn, but it is noted that any reasons the State has to justify its actions should be presented at this time, and not after the court has already ruled.