[802 NYS2d 476]

John Langan, Individually and as Executor of Neil Conrad Spicehandler, Also known as Neal Spicehandler, Deceased, Respondent, v St. Vincent's Hospital of New York, Appellant.

Second Department, October 11, 2005

## APPEARANCES OF COUNSEL

*Costello, Shea & Gaffney, LLP*, New York City (*Frederick N. Gaffney, Paul E. Blutman* and *Richard Paul Stone* of counsel), for appellant.

*David L. Taback, P.C.*, New York City, and *Lambda Legal Defense and Education Fund, Inc.*, New York City (*Adam Aronson* and *Susan L. Sommer* of counsel), for respondent.

*Eliot Spitzer, Attorney General*, New York City (*Caitlin J. Halligan* and *Sachin S. Pandya* of counsel), amicus curiae pro se.

*Jay Weiser*, New York City, for Association of the Bar of the City of New York, amicus curiae.

*Jo M. Katz*, New York City, for Women's Bar Association, amicus curiae (joining in brief of Association of the Bar of the City of New York).

*Marilyn J. Flood*, New York City, for New York County Lawyers' Association, amicus curiae (joining in brief of Association of the Bar of the City of New York).

*Patrick C. O'Reilly*, Buffalo, for American Academy of Matrimonial Lawyers, amicus curiae (joining in brief of Association of the Bar of the City of New York).

## OPINION OF THE COURT

LIFSON, J.

The underlying facts of this case are not in dispute. After many years of living together in an exclusive intimate relationship, Neil Conrad Spicehandler (hereinafter Conrad) and John Langan endeavored to formalize their relationship by traveling to Vermont in November 2000 and entering into a civil union. They returned to New York and continued their close, loving, committed, monogamous relationship as a family unit in a manner indistinguishable from any traditional marital relationship.

In February 2002 Conrad was hit by a car and suffered a severe fracture requiring hospitalization at the defendant St. Vincent's Hospital of New York. After two surgeries Conrad died.

The plaintiff commenced the instant action which asserted, inter alia, a claim pursuant to EPTL 5-4.1 to recover damages for the decedent's wrongful death. The defendant moved, inter alia, to dismiss that cause of action on the ground that the plaintiff and the decedent, being of the same sex, were incapable of being married and, therefore, the plaintiff had no standing as a surviving spouse to institute the present action. The Supreme Court, inter alia, denied that motion and the instant appeal ensued. For the reasons stated below, the Supreme Court's order must be reversed insofar as appealed from.

An action alleging wrongful death, unknown at common law, is a creature of statute requiring strict adherence to the four corners of the legislation (*see Carrick v Central Gen. Hosp.*, 51 NY2d 242 [1980]; *Liff v Schildkrout*, 49 NY2d 622 [1980]). The relevant portion of EPTL 5-4.1 provides as follows: "The personal representative, duly appointed in this state or any other jurisdiction, of a decedent *who is survived by distributees* may maintain an action to recover damages for a wrongful act, neglect or default which caused the decedent's death" (emphasis added). The class of distributees is set forth in EPTL 4-1.1. Included in that class is a surviving spouse. At the time of the drafting of these statutes, the thought that the surviving spouse would be of the same sex as the decedent was simply inconceivable and certainly there was no discriminatory intent to deny the benefits of the statute to a directed class. On the contrary, the clear and unmistakable purpose of the statute was to afford distributees a right to seek compensation for loss sustained by the wrongful death of the decedent (*see Shu-Tao Lin v McDonnell Douglas Corp.*, 742 F2d 45 [1984]).

Like all laws enacted by the people through their elected representatives, EPTL 5-4.1 is entitled to a strong presumption that it is constitutional (*see Matter of Moran Towing Corp. v Urbach*, 99 NY2d 443 [2003]; *Cohen v State of New York*, 94 NY2d 1 [1999]). The plaintiff claims that application of the statute in such a manner as to preclude same-sex spouses as potential distributees is a violation of the Equal Protection Clauses of the Constitutions of the United States and the State of New York. However, any equal protection analysis must recognize that virtually all legislation entails classifications for one purpose or another which results in the advantage or disadvantage to the affected groups (*see Romer v Evans*, 517 US 620 [1996]). In order to survive constitutional scrutiny a law needs only to have a rational relationship to a legitimate state interest even if the

law appears unwise or works to the detriment of one group or the other (*see Romer v Evans, supra*). Thus, the plaintiff must demonstrate that the denial of the benefits of EPTL 5-4.1 to same-sex couples is not merely unwise or unfair but serves no legitimate governmental purpose. The plaintiff has failed to meet that burden.

In the absence of any prior precedent, the court would have to analyze whether the statute imposes a broad and undifferentiated disadvantage to a particular group and if such result is motivated by an animus to that group (*see Romer v Evans, supra*). However, in this instance, it has already been established that confining marriage and all laws pertaining either directly or indirectly to the marital relationship to different sex couples is not offensive to the Equal Protection Clause of either the federal or state constitutions. In *Baker v Nelson* (291 Minn 310, 191 NW2d 185 [1971]), the Supreme Court of Minnesota held that the denial of marital status to same-sex couples did not violate the Fourteenth Amendment of the United States Constitution. The United States Supreme Court refused to review that result (*see Baker v Nelson*, 409 US 810 [1972]). The plaintiff herein cannot meet his burden of proving the statute unconstitutional and does not refer this Court to any binding or even persuasive authority that diminishes the import of the *Baker* precedent.

On the contrary, issues concerning the rights of same-sex couples have been before the United States Supreme Court on numerous occasions since *Baker* and, to date, no justice of that Court has ever indicated that the holding in *Baker* is suspect. Although in *Lawrence v Texas* (539 US 558 [2003]) the Supreme Court ruled that laws criminalizing activity engaged in by same-sex couples and potentially adversely affecting their liberty interests could not withstand constitutional scrutiny, every justice of that Court expressed an indication that exclusion of marital rights to same-sex couples did promote a legitimate state interest. Justices Scalia, Thomas, and Rehnquist concluded that disapprobation of homosexual conduct is a sufficient basis for virtually any law based on classification of such conduct. The majority opinion of Justices Kennedy, Stevens, Ginsburg, Souter, and Breyer declined to apply an equal protection analysis and nonetheless expressly noted that the holding (based on the penumbra of privacy derived from *Griswold v Connecticut*, 381 US 479 [1965]) did not involve or require the government to give formal recognition to any relationship that homosexuals

wish to enter (*see Lawrence v Texas, supra* at 578). Justice O'Connor, in her concurring opinion based on an equal protection analysis, specifically excluded marriage from the import of her conclusions, stating simply "other reasons exist to promote the institution of marriage beyond mere moral disapproval of an excluded group" (*Lawrence v Texas, supra* at 585).

Similarly, this Court, in ruling on the very same issue in *Matter of Cooper* (187 AD2d 128 [1993], *appeal dismissed* 82 NY2d 801 [1993]) not only held that the term "surviving spouse" did not include same-sex life partners, but expressly stated as follows: "Based on these authorities [including *Baker, supra*], we agree with Acting Surrogate Paused's conclusion that 'purported [homosexual] marriages do not give rise to any rights . . . pursuant to . . . EPTL 5-1.1 [and that] [*n*]o constitutional rights have been abrogated or violated in so holding' " (*Matter of Cooper* at 134-135 [emphasis added]). Although issues involving same-sex spouses have been presented in various contexts since the perfection of this appeal, no court decision has been issued which undermines our obligation to follow our own precedents. Recently, in the somewhat analogous case of *Matter of Valentine v American Airlines* (17 AD3d 38 [2005]), the Appellate Division, Third Department, in denying spousal status to same-sex couples for purposes of workers' compensation claims, cited both *Baker* and *Cooper* with approval. Thus, no cogent reason to depart from the established judicial precedent of both the courts of the United States and the courts of the State of New York has been demonstrated by the plaintiff or our dissenting colleagues.

The fact that since the perfection of this appeal the State of Massachusetts has judicially created such right for its citizens is of no moment here since the plaintiff and the decedent were not married in that jurisdiction. They opted for the most intimate sanctification of their relationship then permitted, to wit, a civil union pursuant to the laws of the State of Vermont. Although the dissenters equate civil union relationships with traditional heterosexual marriage, we note that neither the State of Vermont nor the parties to the subject relationship have made that jump in logic. In following the ruling of its Supreme Court in the case of *Baker v State* (170 Vt 194, 744 A2d 864 [1999]) the Vermont Legislature went to great pains to expressly decline to place civil unions and marriage on an identical basis. While affording same-sex couples the same rights as those afforded married couples, the Vermont Legislature refused to alter

traditional concepts of marriage (i.e., limiting the ability to marry to couples of two distinct sexes) (*see* Vt Stat Ann, tit 15, §§ 8, 1201 [4]). The import of that action is of no small moment. The decedent herein, upon entering the defendant hospital, failed to indicate that he was married. Moreover, in filing the various probate papers in this action, the plaintiff likewise declined to state that he was married. In essence, this Court is being asked to create a relationship never intended by the State of Vermont in creating civil unions or by the decedent or the plaintiff in entering into their civil union. For the same reason, the theories of full faith and credit and comity have no application to the present fact pattern.

The circumstances of the present case highlight the reality that there is a substantial segment of the population of this state that is desirous of achieving state recognition and regulation of their relationships on an equal footing with married couples. There is also a substantial segment of the population of this state that wishes to preserve traditional concepts of marriage as a unique institution confined solely to one man and one woman. Whether these two positions are not so hopelessly at variance (to all but the extremists in each camp) to prevent some type of redress is an issue not for the courts but for the Legislature. Unlike the court, which can only rule on the issues before it, the Legislature is empowered to act on all facets of the issue including, but not limited to, the issues of the solemnization and creation of such relationships, the dissolution of such relationships and the consequences attendant thereto, and all other rights and liabilities that flow from such a relationship. Any contrary decision, no matter how circumscribed, will be taken as judicial imprimatur of same-sex marriages and would constitute a usurpation of powers expressly reserved by our Constitution to the Legislature. Accordingly, the order must be reversed insofar as appealed from.

FISHER, J. (dissenting). The majority's forceful defense of the Legislature's prerogative to define what constitutes a marriage in New York seems to me to miss the point. This case is not about marriage. The plaintiff does not claim to have been married to the decedent, and clearly he was not, either under the laws of New York or in the eyes of Vermont.

What this case is about is the operation of a single statute—New York's wrongful death statute—that controls access to the courts for those seeking compensation for the loss of a pecuni-

ary expectancy created and guaranteed by law. The statute provides such access to a decedent's surviving spouse because the wrongful death of one spouse deprives the other of an expectation of continued support which the decedent would have been obligated by law to provide (*see e.g.* Family Ct Act § 412; Social Services Law § 101 [1]).[1] But, as applied here, the statute does not permit the surviving member of a Vermont civil union to sue for wrongful death, even though, like spouses, each member of the civil union is obligated by law to support the other (*see* Vt Stat Ann, tit 15, § 1204 [c]). The principal question presented, therefore, is whether, as it currently operates to permit spouses but not partners in a Vermont civil union to sue for wrongful death, the law draws a distinction between similarly-situated persons on the basis of sexual orientation and, if so, whether the distinction bears some rational relationship to any conceivable governmental objective promoted by the statute. Because I conclude that the statute as applied here does classify similarly-situated persons on the basis of sexual orientation without a rational relationship to any conceivable governmental purpose furthered by the statute, I respectfully dissent.

The facts are largely undisputed.

The plaintiff, John Langan, and the decedent, Neil Conrad Spicehandler, met in 1986 and soon began an intimate relationship that proved to be both stable and long lasting. Thirteen years later, they were living together in New York when the Supreme Court of Vermont issued its decision in *Baker v State* (170 Vt 194, 744 A2d 864 [1999]). The court held that the Common Benefits Clause of the Vermont Constitution (*see* Vt Const, ch I, art 7) required that same-sex couples be granted the same statutory benefits and protections enjoyed by persons of the opposite sex who choose to marry, and it ordered the State to fashion a remedy to achieve that result (*see Baker v State, supra,* 170 Vt at 197-198, 744 A2d at 867).

As the majority correctly points out, Vermont's Legislature responded by reaffirming the State's traditional view that " '[marriage' means the legally recognized union of one man and one woman]'' (Vt Stat Ann, tit 15, § 1201 [4]). It then established a new, parallel legal status, called a civil union, for same-sex couples not eligible to marry under Vermont law (Vt

---

**1.** The statute does not limit wrongful death plaintiffs to spouses. Indeed, in some circumstances, because of their possible financial expectancy, the statute authorizes wrongful death suits by a decedent's relatives as far distant as first cousin, once removed (*see* EPTL 4-1.1 [a] [7]).

Stat Ann, tit 15, § 1202). The new legislation prescribed how a civil union could be established (*see id.*), and how it could be dissolved (*see* Vt Stat Ann, tit 15, § 1206). And it provided that those who establish a civil union would have the same benefits, protections, and responsibilities as married couples had in Vermont (*see* Vt Stat Ann, tit 15, § 1204 [e]), including, importantly, the responsibility "for the support of one another to the same degree and in the same manner as prescribed under law for married persons" (Vt Stat Ann, tit 15, § 1204 [c]).[2]

In November 2000, approximately four months after Vermont's civil union law went into effect, the plaintiff and the decedent traveled to Vermont with some 40 family members and friends and solemnized a civil union in a ceremony performed by a justice of the peace in accordance with Vermont law. After the ceremony, the plaintiff and the decedent returned to their home, and to their lives, in New York.

On February 12, 2002, the decedent was injured in midtown Manhattan by a hit-and-run driver. He was admitted to St. Vincent's Hospital of New York (hereinafter St. Vincent's) where he underwent two surgeries to address open fractures to his left tibia and fibula. At first, the plaintiff was told by hospital staff that the surgeries had been successful and that the decedent would be discharged. On the morning of February 15, 2002, however, the plaintiff received a telephone call from a physician at St. Vincent's informing him that the decedent had died.

The plaintiff subsequently commenced this action against St. Vincent's, both on his own behalf and as executor of the decedent's estate. As executor, he sought damages, inter alia, for medical malpractice and lack of informed consent. On his own behalf, he sought damages for wrongful death.

The defendant St. Vincent's moved, inter alia, to dismiss the wrongful death claim on the ground that the plaintiff was not the decedent's distributee and therefore could not recover damages for his wrongful death. The plaintiff cross-moved for summary judgment on the issue of his standing to assert the wrongful death claim. He argued that his status under Vermont's civil union law entitled him to sue as the decedent's surviving spouse.

In a detailed opinion, the Supreme Court denied St. Vincent's motion and granted the plaintiff's cross motion. The court found

---

2. Effective October 1, 2005, Connecticut became the second state to allow same-sex couples to enter into civil unions conferring "all the same benefits, protections and responsibilities under law . . . as are granted to spouses in a marriage" (2005 Conn Pub Acts 05-10 § 14).

that, because the plaintiff qualified as a surviving spouse under the laws of Vermont, he was included within the meaning of "spouse" as that term is used in New York's Estates, Powers and Trusts Law and therefore had standing to recover for the wrongful death of the decedent (*see Langan v St. Vincent's Hosp. of N.Y.*, 196 Misc 2d 440 [2003]). This appeal followed.[3]

New York's Estates, Powers and Trusts Law (hereinafter EPTL) allows an action for the wrongful death of any individual who is survived by one or more distributees, with the recovery to provide compensation for economic injuries suffered as a result of the death (*see* EPTL 5-4.1 [1]; 5-4.4 [a]). A distributee is any person who may be entitled under law to take or share in the decedent's property not disposed of by will (*see* EPTL 1-2.5, 4-1.1). Distributees include certain of the decedent's blood relatives, his or her adopted children, and, unless disqualified, his or her "spouse" (*see* EPTL 4-1.1, 5-1.2).

The majority writes that it would have been inconceivable to the drafters of the wrongful death statute that the surviving spouse would be of the same sex as the decedent. I agree.

Although the term "spouse" is not defined in the EPTL, its use in several provisions in that chapter leaves no doubt that it was intended to include only those persons joined together in marriage (*see Raum v Restaurant Assoc.*, 252 AD2d 369, 370 [1998]). For example, both sections 5-1.1 (b) (1) and 5-1.1-A (b) (1) of the EPTL explicitly refer to "the date of the marriage" in determining whether a transaction benefitting the "spouse" constitutes a testamentary substitute. Similarly, both EPTL 5-1.1 (f) (3) (A) and 5-1.1-A (e) (3) (A) provide, inter alia, that the waiver or release of the right of election is effective, whether executed "before or after the marriage of the spouses." And, perhaps most significantly, EPTL 5-1.2 (a) (1) and (2) provide that, within the meaning and for the purposes of the wrongful death statute, "[a] husband or wife is a surviving spouse" unless, inter alia, "[a] final decree or judgment of divorce, of annulment or declaring the nullity of a marriage . . . was in effect when the deceased spouse died," or "[t]he marriage was void as incestuous . . . , bigamous . . . , or a prohibited remarriage . . . ."

---

**3.** New York's Attorney General has submitted an amicus curiae brief urging affirmance, and the Court has received a second amicus brief, also urging affirmance, submitted by the Association of the Bar of the City of New York, and joined in by the New York County Lawyers' Association, the Women's Bar Association of the State of New York, and the New York Chapter of the American Academy of Matrimonial Lawyers.

Significantly, although the EPTL has a number of different statutory sources, these particular sections—EPTL 1-2.5, 4-1.1, 5-1.1, 5-1.2 and 5-4.1—all share a common predecessor in the Decedent Estate Law (*see* EPTL 14-2.1), and therefore call for a consistent reading of the word "spouse." Clearly, then, the drafters of these EPTL sections contemplated that the word "spouse" would apply only to a person who had been married to the decedent at the time of death, and since the notion of same-sex marriage was largely unknown at the time, the majority is correct in saying that it would have been inconceivable to the drafters that the decedent and the surviving spouse would be of the same sex.

Indeed, even in more recent years, although New York's Legislature has provided same-sex couples with certain rights and benefits, it has not seen fit to include them in the class of persons entitled to assert a wrongful death claim. For example, in the wake of the attacks of September 11, 2001, and more than two years after Vermont established civil unions, the Legislature declared, inter alia:

> "that domestic partners of victims of the terrorist attacks are eligible for distributions from the federal victim compensation fund, and the requirements for awards under the New York State World Trade Center Relief Fund and other existing state laws, regulations, and executive orders should guide the federal special master in determining awards and ensuring that the distribution plan compensates such domestic partners for the losses they sustained" (L 2002, ch 73, § 1).

Subsequently, the Legislature enacted Workers' Compensation Law § 4 for the specific purpose of providing death benefits to domestic partners of those killed on September 11, 2001 (*see* L 2002, ch 467, § 1). Indeed, the wrongful death statute itself was amended to lengthen the limitations period for the commencement of actions on behalf of decedents whose deaths were caused by the September 11th terrorist attacks (*see* EPTL 5-4.1, as amended by L 2003, ch 114, § 1). Yet the Legislature did not see fit to grant unmarried domestic partners the right to maintain an action to recover damages for wrongful death.

Because the wrongful death statute is in derogation of the common law, it must be strictly construed (*see Gonzalez v New York City Hous. Auth.*, 77 NY2d 663, 667 [1991]). Thus, I agree with the majority that the term "spouse" as used in EPTL

4-1.1 is limited to those persons who were married to a decedent at the time of death and cannot, through statutory construction, be interpreted expansively to include persons like the plaintiff and the decedent here who were partners in a Vermont civil union but were not joined in marriage (*see Matter of Cooper*, 187 AD2d 128 [1993]).

As an alternative, the plaintiff attempts to invoke principles of equity to secure the right to bring this action. Relying on *Braschi v Stahl Assoc. Co.* (74 NY2d 201 [1989]), the plaintiff argues that, even if he does not expressly fall within the meaning of "spouse" as used in the EPTL, New York is nevertheless bound by considerations of equity to recognize his right to recover for the decedent's wrongful death. In *Braschi,* the Court of Appeals was called upon to interpret a rent-control regulation providing that, upon the death of a tenant, the landlord may not dispossess "either the surviving spouse of the deceased tenant or some other member of the deceased tenant's family who has been living with the tenant" (*id.* at 206, quoting 9 NYCRR 2204.6 [d]). Noting that rent-control laws must be interpreted broadly to effectuate their purposes (*Braschi v Stahl Assoc. Co., supra* at 208), the Court held that the gay life partner of the deceased tenant could, under appropriate circumstances, fall within the meaning of the word "family" (*id.* at 211).

Unlike the noneviction right at issue in *Braschi,* however, the right to assert a wrongful death claim is a vested property right (*see DeLuca v Gallo,* 287 AD2d 222, 225 [2001]) that does not exist at common law or in equity. As a creature of statute, it must be founded on statutory authority (*see Liff v Schildkrout,* 49 NY2d 622, 632 [1980]). Hence, if the plaintiff does not qualify as a "distributee" under the EPTL, he cannot otherwise assert a wrongful death claim under general principles of equity.

The majority appears to conclude that, simply because the plaintiff and the decedent were not married, "the theories of full faith and credit and comity have no application." It is certainly true that the constitutional requirement of full faith and credit need not be considered here, if for no other reason than that the plaintiff has specifically disavowed reliance on it.[4] But the plaintiff and amici do strongly argue that New York is

---

4. I note that, in any event, "the Full Faith and Credit Clause does not compel a state to substitute the statutes of other states for its own statutes dealing with a subject matter concerning which it is competent to legislate" (*Franchise Tax Bd. of Cal. v Hyatt,* 538 US 488, 494 [2003] [internal quotation marks and citation omitted]) so long as the state has "a significant contact or-

bound to afford the plaintiff the right to sue for wrongful death because the doctrine of comity requires recognition of the "spousal rights" he derives from the laws of Vermont. I cannot agree.

A state is never obliged by considerations of comity to surrender its legitimate interests in deference to another state's policy choices. As the Court of Appeals has explained:

> "The doctrine of comity 'is not a rule of law, but one of practice, convenience and expediency.' It does not of its own force compel a particular course of action. Rather, it is an expression of one State's entirely voluntary decision to defer to the policy of another . . . Today in New York the determination of whether effect is to be given foreign legislation is made by comparing it to our own public policy; and our policy prevails in case of conflict" (*Ehrlich-Bober & Co. v University of Houston*, 49 NY2d 574, 580 [1980] [internal quotation marks and citations omitted]; *see also De Rose v New Jersey Tr. Rail Operations*, 165 AD2d 42, 44-45 [1991]).

New York has long chosen, as a matter of comity, to recognize a marriage considered valid in the place where it was celebrated, even if it could not have been lawfully entered in this state, provided only that the Legislature has not expressly prohibited New Yorkers from entering the particular kind of marriage, and its recognition would not otherwise be abhorrent to New York's public policy (*see Matter of May*, 305 NY 486 [1953]; *Moore v Hegeman*, 92 NY 521 [1883]; *Thorp v Thorp*, 90 NY 602 [1882]; *Van Voorhis v Brintnall*, 86 NY 18 [1881]). The stated purpose of such recognition is "to prevent the great inconvenience and cruelty of bastardizing the issue of such marriages, and to avoid the public mischief which would result from the loose state in which people so situated would live" (*Van Voorhis v Brintnall* at 26, quoting *Haviland v Halstead*, 7 Tiff 643, 647 [1866]).

The plaintiff acknowledges, as he must, that he and the decedent never entered a marriage. Nevertheless, he and amici maintain that the same considerations of comity must lead New York to recognize his Vermont civil union inasmuch as there is nothing to suggest that a civil union of same-sex individuals is abhorrent to the public policy of New York (*cf.* Workers'

significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair" (*Allstate Ins. Co. v Hague*, 449 US 302, 313 [1981]).

Compensation Law § 4; Executive Law § 291 [1], [2]; Civil Rights Law § 40-c; 18 NYCRR 421.16 [h] [2]; *Matter of Jacob*, 86 NY2d 651, 662 [1995]; *Braschi v Stahl Assoc. Co., supra*; *People v Onofre*, 51 NY2d 476 [1980], *cert denied* 451 US 987 [1981]). But recognition of a civil status validly created outside of New York does not necessarily imply that this state will give effect to all of the legal incidents of that status conferred by the foreign jurisdiction that created it. Where those incidents conflict with New York law, our courts will generally decide whether to give them effect by looking to traditional choice-of-law principles.

In *Matter of Chase* (127 AD2d 415 [1987]), for example, children adopted under the laws of Rhode Island but living in New York sought to inherit from their natural parents. Under New York law, a child's right to inherit from his or her natural parents is extinguished upon adoption (*see* Domestic Relations Law § 117 [1] [b]) but the same is not true under the laws of Rhode Island (*see* RI Gen Laws § 15-7-17).

Ruling that the children could not inherit from their natural parents, the Court wrote:

> "While the parties agree that New York, by the law of comity, must recognize [the children's] status as adopted, even though such status was acquired under the laws of Rhode Island . . . , they disagree concerning which State's law controls the adjudication of [the children's] rights as adopted children . . . Even where a status created in another jurisdiction is recognized by a court of this State, all of the incidents which the other jurisdiction attaches to such status need not be recognized . . . [T]he rights of [the children] to inherit must be determined pursuant to New York law. Such result is not unfair here since Rhode Island has no contacts with this case other than the fact that the adoption decree was rendered there. On the other hand, New York was the domicile of decedent and New York has a strong interest in enforcing its statute regarding the inheritance rights of adopted children." (*Matter of Chase, supra* at 417; *see also Matter of Crichton*, 20 NY2d 124 [refusing application of Louisiana community property laws to govern right of New York domiciliary to her deceased husband's personal property located in Louisiana].)

The right to maintain an action for wrongful death is a legal incident of the status conferred by Vermont's civil union law (*see* Vt Stat Ann, tit 15, § 1204 [e] [2]). On the question of whether to give that incident effect here, I find it significant that there is no evidence that the plaintiff and the decedent had any contacts with Vermont beyond the fact that their civil union was solemnized there. Moreover, Vermont enacted its civil union law in response to a holding of its Supreme Court that same-sex couples were entitled to legal acknowledgment *"as Vermonters* who seek nothing more, nor less, than legal protection and security for their avowed commitment to an intimate and lasting human relationship" (*Baker v State, supra,* 170 Vt at 229, 744 A2d at 889 [emphasis supplied]), and that, under the Common Benefits Clause of the state's Constitution, committed same-sex couples had the right to the "common benefits and protections that flow from marriage *under Vermont law"* (170 Vt at 226, 744 A2d at 887 [emphasis supplied]). There was nothing either in the Court's decision or in the legislation it produced to suggest that Vermont's concern was other than purely local or that it intended to affect the rights of same-sex couples beyond its own borders. Vermont, therefore, has no legitimate interest in determining whether the plaintiff, a resident of New York, has the right to maintain a wrongful death action against a New York defendant in connection with the death of another resident of New York occurring in this state. Indeed, during virtually all of their lives together, the plaintiff and the decedent resided in New York, and it was in this state that the conduct complained of occurred and the decedent died. Under these circumstances, New York certainly has the most significant contacts with the case and, therefore, the stronger interest in applying the provisions of its own wrongful death law (*see e.g. Padula v Lilarn Props. Corp.,* 84 NY2d 519, 522 [1994]; *compare Wooden v Western N.Y. & Pa. R.R. Co.,* 126 NY 10 [1891] [applying Pennsylvania's wrongful death statute, which permitted widow to sue in her own name, where death occurred in Pennsylvania]). Accordingly, like the majority, I reject the contention that the doctrine of comity demands that the plaintiff be permitted to sue in New York for wrongful death.

I turn, then, to the area of my disagreement with the majority's resolution of the appeal.

When a statute affords different treatment to similarly-situated persons on the basis of a constitutionally cognizable characteristic, the disparity of treatment must, at the least,

bear some rational relationship to a legitimate governmental objective promoted by the statute. As the United States Supreme Court long ago explained:

"It is unnecessary to say that the 'equal protection of the laws' required by the Fourteenth Amendment does not prevent the states from resorting to classification for the purposes of legislation . . . But the classification must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike" (*F.S. Royster Guano Co. v Virginia*, 253 US 412, 415 [1920]).

Stated otherwise, "[t]he Equal Protection Clause . . . [denies] to States the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute" (*Reed v Reed*, 404 US 71, 75-76 [1971]). The question to be addressed, therefore, is whether, considering the purpose and objective of the wrongful death statute, there is some ground of difference that rationally explains the different treatment the statute accords to spouses and partners in a Vermont civil union (*see Eisenstadt v Baird*, 405 US 438, 447 [1972]).

The purpose of the wrongful death statute is well-defined and firmly established. It is not intended to recompense the survivor for the loss of companionship or consortium, or for the pain and anguish that accompanies the wrongful and unexpected loss of a loved one. It is instead designed solely to make a culpable tortfeasor liable for fair and just compensation to those who, by reason of their relationship to the decedent, suffer economic injury as a result of the decedent's death (*see* EPTL 5-4.3 [a]). A person suffers economic injury in this context when the death deprives him or her of a reasonable expectation of future financial assistance or support from the decedent (*see Gonzalez v New York City Hous. Auth., supra* at 667; *Parilis v Feinstein*, 49 NY2d 984 [1980]).

The plaintiff argues that, with respect to that objective, the wrongful death statute classifies similarly-situated persons on the basis of their sexual orientation. Sexual orientation is a constitutionally cognizable characteristic, and therefore when legislation is challenged on the ground that it classifies and treats persons differently on the basis of sexual orientation, courts will "insist on knowing the relation between the clas-

sification adopted and the object to be attained" (*Romer v Evans*, 517 US 620, 632 [1996]). This was so even before the Supreme Court repudiated *Bowers v Hardwick* (478 US 186 [1986]), which upheld statutes criminalizing homosexual sodomy—the very conduct some saw as defining the class (*see e.g. Padula v Webster*, 822 F2d 97, 103 [1987]). It certainly is true after the Supreme Court expressly overruled *Bowers*, recognizing that it "demean[ed] the lives of homosexual persons" "was not correct when it was decided, [and] is not correct today" (*Lawrence v Texas*, 539 US 558, 575, 560 [2003]).

As to whether the wrongful death statute classifies on the basis of sexual orientation, I recognize that, in 1998, the Appellate Division, First Department, concluded that it did not, rejecting an equal protection challenge to the statute brought by the surviving member of an informal same-sex relationship not sanctioned by any state (*see Raum v Restaurant Assoc., supra*). The Court wrote:

> "[T]he wrongful-death statute (EPTL 5-4.1), which, by its terms (EPTL 1-2.5, 4-1.1, 5-1.2), does not give individuals not married to the decedent (other than certain blood relatives) a right to bring a wrongful-death action, operates without regard to sexual orientation, in that unmarried couples living together, whether heterosexual or homosexual, similarly lack the right to bring a wrongful-death action, and, as such, the statute does not discriminate against same-sex partners in spousal-type relationships" (*id.* at 370; *see also Levin v Yeshiva Univ.*, 272 AD2d 158 [2000]).

Leaving aside the fact that opposite-sex couples who remain unmarried do so out of choice while same-sex couples have little choice but to remain unmarried, the classification here is not between unmarried opposite-sex couples who choose to live together in an informal arrangement, and unmarried same-sex couples who do the same. The classification at issue here is between couples who enter into a committed, formalized, and state-sanctioned relationship that requires state action to dissolve and, perhaps most important, makes each partner legally responsible for the financial support of the other. For opposite-sex couples, of course, the relationship is marriage, sanctioned and recognized by the State (*see e.g.* Domestic Relations Law § 14-a), requiring a divorce or annulment to dissolve (*see e.g.* Domestic Relations Law §§ 140, 170), and obligating each spouse

to provide for the support of the other (*see e.g.* Family Ct Act § 412; Social Services Law § 101 [1]). And, as relevant here, the relationship for same-sex couples is the Vermont civil union, sanctioned and recognized by the State (*see* Vt Stat Ann, tit 15, § 1201), requiring a court proceeding to dissolve (*see* Vt Stat Ann, tit 15 § 1206), and obligating each party to provide for the support of the other (*see* Vt Stat Ann, tit 15 § 1204 [c]).[5]

With respect to the objectives of the wrongful death statute, spouses and parties to a Vermont civil union stand in precisely the same position. Marriage creates a legal and enforceable obligation of mutual support (*see e.g.* Family Ct Act § 412; Social Services Law § 101 [1]), and therefore the death of one spouse causes economic injury to the other because it results in the loss of an expectancy of future support created and guaranteed by law. And, in exactly the same way, because the state-sanctioned Vermont civil union gives rise to a legal and enforceable obligation of mutual support (*see* Vt Stat Ann, tit 15, § 1204 [c]), the death of one party to the union causes economic injury to the survivor because it results in the loss of an expectancy of future

---

**5.** I note that, unlike the right to commence a wrongful death action, the obligation of mutual support must be considered more than simply an incident of a Vermont civil union, unenforceable in New York under the doctrine of comity. The obligation of mutual support defines an essential element of the civil union itself. From a choice of law standpoint, Vermont, as the *locus celebrationis*, has a fundamental and continuing interest in defining the mutual rights and obligations of parties electing to enter a civil union in that state. Moreover, by purposefully availing themselves of Vermont law and following its formalities, those entering a civil union demonstrate their intention to be bound by a mutual obligation of support, and there is nothing in the public policy of New York to suggest that a court in this state would be constrained to refuse to recognize the existence or validity of such an obligation, at least for the limited purpose of determining whether one party to a civil union had a legitimate expectation of receiving future support from the other. In any event, for present purposes, whether a court of this state, as a matter of jurisdiction or procedure, can enforce that obligation directly is of no moment because a party to a Vermont civil union always retains, at minimum, the option of returning to Vermont, obtaining relief from a Vermont court once the applicable residency period has been fulfilled (*see* Vt Stat Ann, tit 15, §§ 1206, 592), and later seeking to enforce the Vermont judgment in New York (*see e.g.* Schoonheim v Epstein, 123 AD2d 549 [1986]). Either way, the availability of relief in a support proceeding would rest upon the recognition of an obligation validly created by Vermont law, freely agreed to by the parties involved, and affecting them, and them alone. By contrast, the right to commence a wrongful death action implicates, not only the question of legal status as between the claimant and the decedent, but also the rights of a third-party tortfeasor and the State's interest in imposing liability on that tortfeasor. As previously demonstrated, under the facts of this case, Vermont simply has no legitimate interest in applying its wrongful death statute here under any conceivable choice of law analysis.

support also created and guaranteed by law. Because no statute or authoritative holding in New York now permits or recognizes a marriage except between opposite-sex couples, and because Vermont civil unions are open only to same-sex couples (*see* Vt Stat Ann, tit 15, § 1202 [2]), the operation here of New York's wrongful death statute to authorize a party to a marriage to recover damages for the wrongful death of his or her spouse, but not to permit a party to a Vermont civil union to recover damages for the wrongful death of his or her partner, in effect, affords different treatment to similarly-situated persons on the basis of sexual orientation.

The question, then, is whether there is a rational relationship between that disparity of treatment and some legitimate governmental interest or purpose (*see Romer v Evans, supra* at 631-632; *Heller v Doe*, 509 US 312, 320 [1993]; *Schweiker v Wilson*, 450 US 221, 230 [1981]; *Matter of Cooper, supra* at 134).[6] Ordinarily, when constitutional challenges are raised against laws prohibiting same-sex marriage, or laws favoring legal marriages over committed relationships between persons of the same sex, those who defend the challenged provisions do so on the basis of the traditional, religious, cultural, and legal understanding that marriage is the union of one man and one woman, and is the preferred environment for procreation and child-rearing (*see e.g. Seymour v Holcomb*, 7 Misc 3d 530 [2005]; *Matter of Shields v Madigan*, 5 Misc 3d 901, 903 [2004]; *People v Greenleaf*, 5 Misc 3d 337 [2004]; *see also Smelt v County of Orange*, 374 F Supp 2d 861, 880 [2005]; *Lewis v Harris*, 378 NJ Super 168, 181-182, 875 A2d 259, 266-267 [2005]; *Morrison v Sadler*, 821 NE2d 15 [Ind 2005]; *Wilson v Ake*, 354 F Supp 2d 1298, 1308 [2005]; *Goodridge v Department of Pub. Health*, 440 Mass 309, 331, 798 NE2d 941, 961 [2003]; *Standhardt v Superior Ct.*, 206 Ariz 276, 285-289, 77 P3d 451, 460-464 [2003]; *Baker v State*, 170 Vt at 216-219, 744 A2d at 881-882; *Adams v Howerton*, 486 F Supp 1119, 1124 [1980], *affd* 673 F2d 1036 [1982], *cert denied* 458 US 1111 [1982]; *Singer v Hara*, 11 Wash App 247, 259-260, 522 P2d 1187, 1195 [1974]; *Baker v Nelson*, 291 Minn 310, 191 NW2d 185 [1971]). Indeed, our own Court has declared that "[t]he institution of marriage as a union of man and woman, uniquely involving the procreation and[ ] rearing of children within a

---

**6.** The right to equal protection as guaranteed by the New York State Constitution is coextensive with its federal counterpart (*see Under 21, Catholic Home Bur. for Dependent Children v City of New York*, 65 NY2d 344, 360 n 6 [1985]).

family, is as old as the book of Genesis" (*Matter of Cooper, supra* at 133, quoting *Baker v Nelson, supra,* 291 Minn at 312, 191 NW2d at 187, *appeal dismissed* 409 US 810 [1972]; *cf. Skinner v Oklahoma ex rel. Williamson,* 316 US 535, 541 [1942]). The issue, therefore, is whether New York's interest in fostering traditional marriage, and in preferring it to any other relationship between unrelated adults, is in any conceivable way advanced or promoted by a law that authorizes a surviving spouse, but not a surviving member of a Vermont civil union, to sue for wrongful death. Two cases decided by the United States Supreme Court are instructive on this question, and both involve the right to sue for wrongful death.

In *Levy v Louisiana* (391 US 68 [1968]), the Supreme Court struck down a statute which, because it was construed to authorize only legitimate children to maintain an action for the wrongful death of a parent, precluded five illegitimate children from suing for the wrongful death of their mother. The Supreme Court wrote:

> "Legitimacy or illegitimacy of birth has no relation to the nature of the wrong allegedly inflicted on the mother. These children, though illegitimate, were dependent on her; she cared for them and nurtured them; they were indeed hers in the biological and in the spiritual sense; in her death they suffered wrong in the sense that any dependent would" (*id.* at 72).

And, in the companion case of *Glona v American Guarantee & Liability Ins. Co.* (391 US 73 [1968]), the Supreme Court struck down the same statute insofar as it was construed to bar a mother from maintaining an action for the wrongful death of her illegitimate child killed in an automobile accident. Here the Court pointedly observed:

> "[W]e see no possible rational basis for assuming that if the natural mother is allowed recovery for the wrongful death of her illegitimate child, the cause of illegitimacy will be served. It would, indeed, be farfetched to assume that women have illegitimate children so that they can be compensated in damages for their death. A law which creates an open season on illegitimates in the area of automobile accidents gives a windfall to tortfeasors. But it hardly has a causal connection with the 'sin,' which

is, we are told, the historic reason for the creation of the disability" (*id*. at 75 [citation omitted]).[7]

I recognize that

"equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices . . . [and that, i]n areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification" (*FCC v Beach Communications, Inc.*, 508 US 307, 313 [1993]; *see also Port Jefferson Health Care Facility v Wing*, 94 NY2d 284, 290 [1999], *cert denied* 530 US 1276 [2000]; *Barklee Realty Co. v Pataki*, 309 AD2d 310, 314 [2003]).

But just as the Supreme Court could find no conceivable rational relationship between any governmental purpose promoted by a wrongful death law and a classification of wrongful death plaintiffs or victims according to their legitimacy, neither can I identify any reasonably conceivable rational basis for classifying similarly-situated wrongful death plaintiffs on the basis of their sexual orientation.

Stated otherwise, I simply cannot reasonably conceive of any way in which New York's interest in fostering and promoting traditional marriage is furthered by a law that determines, based on a person's sexual orientation, whether he or she may have access to our courts to seek compensation for the loss of a pecuniary expectancy created and guaranteed by law (*cf. People v Onofre, supra* at 491-492 [statute permitting consensual sodomy between married persons but banning same conduct between unmarried persons bears no rational relationship to

---

7. In contrast, the Court did find a rational relationship between the classification and the statutory purpose when it considered a challenge to the constitutionality of Louisiana's intestate succession statutes which barred even publicly-acknowledged illegitimate children from sharing equally with legitimate children in the estate of their father when he died without a will. The Court upheld the statutes, noting, inter alia, that they clearly had a rational basis "in view of Louisiana's interest in promoting family life *and of directing the disposition of property left within the State*" (*Labine v Vincent*, 401 US 532, 536 n 6 [1971] [emphasis supplied]; *but see Trimble v Gordon*, 430 US 762 [1977] [striking down, on equal protection grounds, a provision of the Illinois Probate Act which allowed illegitimate children to inherit by intestate succession only from their mother]).

society's interest in fostering and promoting marriage]). And, tellingly, the majority's rejection of the equal protection claim does not include any hint or suggestion of how preventing the plaintiff from asserting a wrongful death claim promotes the State's interest in fostering the institution of marriage, "thus leaving [its] constitutional analysis incomplete" (*Trimble v Gordon*, 430 US 762, 769 [1977]). Indeed, the only real effect of the majority's position is to provide a windfall to a potential tortfeasor.

Accordingly, I respectfully dissent and would hold that the application of New York's wrongful death statute to deny the right of a surviving member of a Vermont civil union to maintain an action to recover damages for the wrongful death of his or her partner is inconsistent with the right to equal protection of the laws. I would further hold that the proper remedy is to extend the benefit of EPTL 5-4.1 to include the plaintiff as a surviving member of a Vermont civil union (*see People v Liberta*, 64 NY2d 152, 170 [1984], *cert denied* 471 US 1020 [1985]; *see also Califano v Westcott*, 443 US 76, 89-90 [1979]). In my judgment, therefore, the order appealed from should be affirmed insofar as appealed from.

H. MILLER, J.P., and SCHMIDT, J., concur with LIFSON, J.; FISHER and CRANE, JJ., dissent and vote to affirm the order in a separate opinion by FISHER, J.

Ordered that the order is reversed insofar as appealed from, on the law, without costs or disbursements, that branch of the motion which was to dismiss the cause of action to recover damages for wrongful death is granted, the cross motion is denied, and the cause of action to recover damages for wrongful death is dismissed.